UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

3:21MJ886 RAK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | ss: Hartford, Connecticut |
| | : | |
| COUNTY OF HARTFORD | : | August 31, 2021 |
| | : | |
| | : | **Filed Under Seal** |

## AFFIDAVIT

I, Matthew Borges, being duly sworn, depose and state as follows:

## I.  INTRODUCTION AND AGENT BACKGROUND

1.      I am a  Task Force Officer (TFO) with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), assigned to the New Haven Field Office.  Accordingly, I am a law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code, that is, an officer empowered by law to conduct investigations of, and make arrests for, offenses enumerated in Section 2516 of Title 18.  I have been employed by ATF as a Task Force Officer since August 2019.  I am an Officer with the New Haven Police Department and have been since January 2, 2013.

2.      I have received specialized training in firearms identification and the investigation of firearms-related offenses.  I have participated in investigations involving the unlawful possession of firearms by prohibited persons, including persons who are previously convicted felons; the possession of firearms in furtherance of the distribution of narcotics; and the use of firearms in the commission of violent acts.  I have participated in investigations involving individuals who unlawfully possess firearms. I have provided testimony in Grand Jury proceedings and spoken with informants and subjects, as well as local and federal law enforcement officers, regarding the manner in which individuals obtain, finance, store, manufacture, transport, and distribute their

1

illegal firearms and drugs. I have received training, both formal and on-the-job, in the provisions of the federal firearms and narcotics laws administered under Titles 18, 21 and 26 of the United States Code.

3.      I have participated in this investigation and, as a result of my participation and information received from other law enforcement officers, I am thoroughly familiar with the circumstances of the investigation and the information set forth in this affidavit. The statements contained in this affidavit are based on my personal participation in the investigation, information provided to me by Special Agents and Task Force Officers of the ATF, and my experience and training.

4.      This affidavit sets forth facts and evidence that are relevant to the requested search and seizure warrants but does not set forth all of the facts and evidence that I have gathered during the course of the investigation of this matter.  Rather, I have only set forth the facts that are necessary to establish probable cause to support the issuance of the arrest warrant and the search and seizure warrant.

## II.      THE TARGET PHONE AND TARGET PREMISES

5.      I submit this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to seize and search the following:

(a)      the iPhone XR cellular device attributed to phone number (860) 455-8037 (the "**TARGET PHONE**"); and

(b)      91B Riverside Drive, Thompson, Connecticut (the "**TARGET PREMISES**").

6.      The locations to be searched are described in the following paragraphs and in Attachment A for the "Target Phone" and Attachment A for the "Target Premises."  The warrants

requested would allow the government to seize the evidence described further in Attachment B for the "Target Phone" and Attachment B for the "Target Premises," respectively.

7.      For the reasons set forth herein, I have probable cause to believe, and I do believe that both the **TARGET PHONE** and the **TARGET PREMISES** contain evidence, contraband, fruits or instrumentalities of violations of Title 18, United States Code, Section 922(a)(1) (Engaging in Firearms Business Without a License); Title 18, United States Code, Section 922(g) (Unlawful Possession of a Firearm by a Convicted Felon); and Title 18, United States Code, 922(d) (Providing a Firearm to a Prohibited Person) ('the Target Offenses").

## III.   **PROBABLE CAUSE**

8.      On April 12, 2021, members of the New Haven Police Department, along with ATF New Haven and Homeland Security Investigations ("HSI") New Haven executed a Connecticut Superior Court search warrant for the third-floor apartment of 211 Spring Street in New Haven. Prior to the execution of that warrant, investigators received information from two different confidential sources that the individual living at that location, ████████ ███ ████████ was a narcotics dealer.  One of the sources was able to provide investigators with ████ phone number at ████ ████████ (the "████ Phone") and as part of the investigation, made a consensually recorded call to ████ at that number wherein ████ agreed to sell narcotics to the source, but the deal did not ultimately go through.

9.      Upon executing the warrant at ████ residence, investigators located a bullet proof vest—which ████ was prohibited from possessing under Connecticut state law because he was a convicted felon—as well as paraphernalia indicative of street level narcotic sales, to include packaging materials and a scale.  Investigators also seized the ████ Phone, which they confirmed by placing a call into the number previously utilized by their confidential source.

10.     Shortly thereafter, on April 23, 2021, based upon evidence collected during the execution of the above warrant, I submitted an affidavit in support of a search and seizure warrant for the ███ Phone, which was issued by the Honorable Sarah A.L. Merriam, U.S.M.J. at Crim. No. 3:21MJ410 (SALM).

**A.     Identification of Daniel HURLOCK**

11.     On July 28, 2021, while reviewing records from the ███ Phone, I located several text messages between ███ and "Dan Dan," who investigators subsequently identified as Daniel HURLOCK (DOB: xx/xx/1997) utilizing phone number (860) 455-8037 (hereinafter, the **"TARGET PHONE"**) beginning on June 30, 2020.  In addition to ███ contact name for HURLOCK being a version of HURLOCK'S first name, Daniel, commercial databases searched by ATF linked the **TARGET PHONE** to HURLOCK. Additionally, records obtained on August 24, 2021 from Verizon d/b/a Cellco Partnership relating to the **TARGET PHONE** identify the subscriber of the phone, an iPhone XR, to be HURLOCK's wife, A.R., as described in greater detail below.  The phone remains active as of the August 19, 2021.  Analysis of the call detail records or "tolls" for the **TARGET PHONE** are consistent with HURLOCK's continued use of the device.  Specifically, a different telephone number associated with A.R. is the most frequently called number, comprising over 30% of the calls during 2021 to date.   In addition, HURLOCK'S grandmother, P.B., is the third most contacted number, and additional relatives, bearing the last names of "Hurlock" and "Villegas," the surname of HURLOCK's father, are also represented.  Therefore, in addition to the **TARGET PHONE**'s interactions with ███ data provided by Verizon further supports probable cause to believe that HURLOCK is the user of the **TARGET PHONE**.

12.     Both HURLOCK and A.R. have Connecticut Driver's Licenses indicating that they reside at 91B Riverside Drive, Thompson, CT (the "**TARGET PREMISES**"). During surveillance at the TARGET PREMISES, ATF has observed the residence to be a side-by-side two-family structure with the "B" side on the south side of the residence.  A review of A.R.'s publicly available Facebook page shows numerous pictures of A.R. and HURLOCK together.  A number of other pictures of A.R. appear to have been taken in the front yard area of the **TARGET PREMISES**.

13.     During surveillance in August 2021, ATF also observed HURLOCK sitting on the front steps of the **TARGET PREMISES** and observed a white Volkswagen at the **TARGET PREMISES** registered to A.R.  During additional surveillance in August 2021, Ramos's Volkswagen and a BMW believed to be used by HURLOCK have been observed parked in a small parking area in the front yard of the residence.   I am also aware from both commercial satellite images and Assessor's data related to 91 Riverside Drive, Thompson, CT (with the "B" unit within representing the **TARGET PREMISES)** that the structure has an attached garage in the rear.  Images obtained from HURLOCK's publicly available Facebook page, which include numerous pictures of HURLOCK and A.R., also include at least one video of HURLOCK appearing to be inside a garage structure that appears consistent with the garage attached to the **TARGET PREMISES**, as set forth in greater detail below.

14.     I have also reviewed HURLOCK'S criminal history records and learned he is convicted felon.  On December 21, 2016, HURLOCK was convicted in Connecticut Superior Court of Robbery 3, a felony offense.  He was sentenced to three years jail, suspended, followed by two years of probation.  Under that same case, on June 16, 2017,

HURLOCK was convicted of violating his probation and was and sentenced to an additional 15 months of imprisonment.  The same case also indicates that on September 19, 2017, HURLOCK was convicted of Failure to Appear.

**B.**   **Evidence of the Target Offenses on the TARGET PHONE**

15.      During review of evidence collected from the ███ Phone, I located several text messages between ███ and another individual subsequently identified as Daniel HURLOCK that appear to reference evidence of gun trafficking, the possession of firearms and firearm parts by prohibited persons, and the illegal manufacturing of firearms, namely the Target Offenses.

16.      For example, on July 15, 2020, HURLOCK using the **TARGET PHONE** and ███ had the following exchange via Instant Messages:

| | |
|---|---|
| 7:17 PM HURLOCK: | "Yo" |
| 7:18 PM HURLOCK: | "U can order the stick from the same company too" |
| 7:21 PM ███ | "I don't need a stick for mine bro" |
| 7:22 PM HURLOCK: | "it don't come with a mag that's all they got on there you gonna have to find one", "The one that got 15 don't come out at all it's a double stack" |
| 7:23 PM ███ | "So I can't take the clip out" |
| 7:24 PM HURLOCK: | "Bro lmfao nah it don't stick out at all i meant" |
| 8:10 PM HURLOCK: | "Bro you gotta break these things in too you need to put a few hundred rounds through it before it runs A1. And you gotta keep it oiled up real good too. It takes a while for the frame to smooth out", "That's how it is for any thing brand new" |
| 8:11 PM HURLOCK: | "Lmk what u want tho the one you said is same size as mine I can get the sub compact ones too they fit in your back pocket" |

17.     Based on my training and experience, I recognize the word "stick" to be street terminology for a magazine to a firearm, particularly a high-capacity magazine, and the reference to a "double stack" relates to a firearms magazine that, instead of having one round directly on top of another, the magazine is nearly double the width, and the rounds are staggered, to allow almost double the capacity of a "single stack" magazine.

18.     HURLOCK also advised ███ that the firearm needed to be broken in and provided specific tasks to do so.  Based on my experience, and conversations with other ATF personnel, I recognize this discussion about "breaking in" to be a reference to the handling and use of personally made firearms ("PMFs"), that is, incomplete firearms wherein the frame or receiver has not been finished and requires the purchaser to complete the firearm by removing some material from the frame or receiver, and then assembling the firearm with additional, non-regulated parts.  The reason that PMFs often need to be "broken in" relates to the fact that commercial firearms manufactures often spend hundreds of thousands or millions of dollars in research and development and tooling and equipment to manufacture firearms, whereas PMFs, being finished by hand with simple tools, often function appropriately and reliably but fall short of quality commercially manufactured firearms.

19.     The next day, on July 16, 2020 at 10:14 p.m. HURLOCK, utilizing the **TARGET PHONE**, messaged ███ a web link to https://fandffirearms.com/, a source out of California which claims to be *The* #1 Source for 80% builders."[1]   A number of companies, including Polymer80, 80%Arms, and 80%Lowers specialize in selling PMFs,

---

[1] HURLOCK's public Facebook page appears to have left a review for F&F Firearms stating, "Damn good quality and fast service! Order something in stock if you are impatient!"  An image of this review was captured by investigators on or about August 19, 2021.

the tools and jigs required to complete firearm frames and receivers, as well as additional, unregulated parts, required to build a functioning firearm.[2] The message from HURLOCK also included a link, with a photograph (Figure 1) of what appears to be a complete firearm and parts kits for F&F Firearms' "G19 V1 BBK THREADED BARREL 9mm" firearm kit.



*Figure 1*

20.     A few days later, on July 22, 2020, at 11:18 p.m. HURLOCK, using the **TARGET PHONE**, messaged ███ "I still got that other shit too that nigga ended up buying the hi point instead." At 11:19 p.m. ███ responded, "Fuck that nigga I'm trying to buy it." This exchange appears to reference an unknown firearm that HURLOCK still has for sale, as an unknown party purchased a HiPoint firearm from HURLOCK instead.

21.     On September 24, 2020, at 9:59 a.m., HURLOCK, using the **TARGET PHONE**, messaged ███ three pictures of firearms, along with the message, "Building

---

[2] I know from my experience with ATF that PMF kits are generally referred to as "80%" firearm kits by the public. This is because, in order to avoid regulation, PMF kit manufacturers marketed these kits (or PMF frames and receivers) and being "80% complete." ATF does not use this terminology and does not use percentages of completion to determine if a firearm is an unfinished part or firearm (or frame or receiver) as defined in Title 18 of the US Code or the Code of Federal Regulations. The marketing term "80%" has caught on over past several years, leading to a large number of PMF suppliers to use some version of "80" or "80%" in their name.

another today the G17." Of the three pictures included in that portion of the conversation, the first picture (Figure 2) has two pistols. Both appear to be PMFs, specifically with Polymer80 frames. The smaller of the two has an aftermarket slide. The larger of the two has a slide from a Glock 22, a threaded barrel which can accept a silencer, an aftermarket charging handle and an extended magazine. The firearms appear to be on a scratched sold surface counter, and a small portion of a floor is visible. There is a pattern with green lines and tan and orange shapes on the floor.



*Figure 2*

22.     The second picture is of a black Polymer80 frame with a Zaffiri Precision slide (Figure 3). The firearm appears to have a laser sight, which is turned on. A loaded magazine is shown near the front of the firearm. The firearm appears to be on a woodgrain table, and other objects can be seen, such as a cellphone charging cord, a hanger, sunglasses,

and other items.  Also visible is a key fob, which appears to be consistent with Volkswagen

vehicles.



*Figure 3*

23.     The third picture is of an AR-15 type rifle with no visible identifying marks

on the left side, which is the only visible side (Figure 4).  The lower receiver appears to be

metal.  The rifle is leaning on a wood-paneled wall, and the floor is carpeted.  In the

background, a portion of a portable baby or toddler playpen is visible, as is what appears to

be a baby or toddler rocking chair.



*Figure 4*

24.     Later on September 24, 2020, at 3:36 p.m. HURLOCK, using the **TARGET PHONE**, messaged ▮▮▮▮ "I got another today glock 17." At 3:38 p.m. ▮▮▮▮ responded, "How much" to which HURLOCK replied, "950," and "22 rounds." In this conversation, I believe that HURLOCK is offering to sell ▮▮▮▮ either a Glock 17, or a PMF equivalent, for $950.00. He notes that the firearm has a 22-round capacity.

25.     On September 27, 2020 at 8:10 p.m.  HURLOCK, using the **TARGET PHONE**, again messaged ▮▮▮▮ "Bro I just made another one brand new g17 that's what ima give u for a stack and a 26 round," to which ▮▮▮▮ responded, "Iight bet." I know that "g17" is common shorthand for a Glock model 17, but I also observed on the F&F Firearms' website previously shared with ▮▮▮▮ by HURLOCK, that F&F Firearms offers a build your

own firearm kit, similar in size to a Glock model 17, with the model name "G17." I believe

in this conversation, HURLOCK is offering to sell this firearm, along with a 26 round

capacity magazine, to ███ for "a stack," which I understand to be a street term for

$1,000.00.

26.     On November 1, 2020, HURLOCK using the **TARGET PHONE** and ███

had the following exchange:

| | |
|---|---|
| 4:51 PM ███ : | "You kant bring it to me", "You know I don't got a l", "You more legit then me" |
| 5:02 PM HURLOCK: | "Bro I can't do it tonight bro. I start my new job is tomorrow and I gotta handle shit tonight. It aint goin nowhere" |
| 5:04 PM HURLOCK: | "The stick and red beam for 1200 all set up ready to go. Otherwise just a band" |
| 5:06 PM ███ : | "My older brother closer to you my blood brother do you mind if I send him to get it bro wrrda my daughter he good bro I promise wrrda blood", "I just Kant go" |
| 5:06 PM HURLOCK: | "Yea bro", "Only meeting one person tho" |
| 5:09 PM ███ | "Yea I know bro", "You know the vibes with me" |
| 5:33 PM HURLOCK: | "Lmk bro" |
| 5:34 PM ███ | "He get off at 6 then stra8 to you bro" |

27.     Investigators know "red beam" to be terminology for a laser sight attached

to a firearm, and that "stick" refers to a high-capacity extended magazine.  Here, HURLOCK

appears to offer the firearm, the extended magazine, and the laser for $1,200.00, or just the

firearm absent those extras for a "band," which is another street term for $1,000.00.  I also

believe that when HURLOCK explains that he cannot bring the firearm to ███ to complete

the sale ["Bro I can't do it tonight bro"], ███ offers to send another person to purchase the

firearm for ███ ["My older brother closer to you my blood brother do you mind if I send him to get it bro . . . I just Kant go"] and when HURLOCK agrees to meet this person ["Yea bro"], ███ confirms that the person will meet HURLOCK straight after work at 6:00 p.m. ["He get off at 6 then stra8 to you bro"].

28.    Approximately three hours later, HURLOCK and ███ have the following exchange:

| | | |
|---|---|---|
| 8:30 PM HURLOCK: | "Appreciate you bro" |
| 8:35 PM ███ | "You know the vibes bro you my nigga" |
| 8:52 PM HURLOCK: | "Facts I already knew dat bro" |

29.    Based on the prior conversation, and the three-hour gap in time, I believe that HURLOCK sent this message to thank ███ for buying the firearm through ███ intermediary.

30.    On November 4, 2020 at 7:27 p.m., HURLOCK, using the **TARGET PHONE** messaged ███ "Small or big I'm bout to order" to which ███ responds, "Big bro." Based on this interaction in the context of prior and subsequent conversations, I believe that HURLOCK is asking in ███ if ███ wants a larger or smaller firearm.

31.    On November 7, 2020, HURLOCK, using the **TARGET PHONE**, and ███ had the following series of exchanges:

| | |
|---|---|
| 3:59 PM HURLOCK: | "Bro my shit will be in Monday I should have it done by the weekend."  Shortly after ███ responded "Ok bro" |
| 10:13 PM HURLOCK: | "Ima show u what I got," and shortly after messaged, "I got 2 mags rn 22 and a 17," "If u want this Glock 22 .40 cal or the new g19 I'm getting lmk. U could Keep the mag that comes wit it too." |
| 10:56 PM ███ | "Hell yea lmk" |

11:02 PM HURLOCK:          "You let me know nigga I want that lmao I want
                          something to match my other Glock 19 so I got
                          twins"

32.    In addition to discussing ▇▇▇ choices for firearms and magazines to
purchase, in the above conversation, HURLOCK indicates that he is waiting for something
to arrive ["my shit will be in on Monday"] and that he will finish "it" "by the weekend."  I
believe this to be a reference to HURLOCK waiting for either an unfinished PMF frame,
other parts, or both, and that he will compete assembly of the firearm prior to, or during, the
weekend.

33.    In the early morning hours of November 8, 2020, HURLOCK and ▇▇▇ had
the following exchange:

12:36 AM HURLOCK:          "Ima come Tomorrow bro u be up ina morning"
12:39 AM ▇▇▇               "Yea bro just kall me".  Shortly after HURLOCK
                          responded, "Kopy"
1:06 AM ▇▇▇                "What time you talking"

34.    Later that morning, HURLOCK and ▇▇▇ continued to exchange messages
regarding, what I believe to be the sale of a firearm and ammunition:

11:31 AM ▇▇▇ :             "Yeoo."  Shortly after HURLOCK responded, "Ima
                          come up there soon."  Shortly after that ▇▇▇
                          responded, "Ok lmk I'm up"
11:38 AM HURLOCK:          "U got shells right"
11:40 AM ▇▇▇               "Just 5 of em"
12:27 PM: HURLOCK:         "I got to be quick when I go bro. I can be there for
                          2pm that good"
12:28 PM ▇▇▇               "Yea," "You good bro"
12:29 PM HURLOCK:          "Send address." Shortly ▇▇▇ responded, "414
                          Greenwich ave new haven ct"

14

| | |
|---|---|
| 12:36 PM HURLOCK: | "Aite bro I just have a crunch today so I gotta move quick", and "30 mins out" |
| 1:34 PM ███: | "Ight" |
| 1:58 PM HURLOCK: | "I had to stop I'm 10 mins away bro." Shortly after ███ responded, "Iight" |
| 1:58 PM HURLOCK: | "U at the spot." Shortly after ███ responded, "Leaving my house now I leave 2 mins always," "Away." Shortly after that HURLOCK responded, "Aite bro." |
| 2:09 PM ███: | "I'm here bro." Shortly after HURLOCK responded, "Bout to get off highway." Shortly after that ███ responded, "Iight." |

35.     I believe that in this exchange, ███ is directing HURLOCK to 414 Greenwich Avenue in New Haven, for the purpose of completing the sale of a firearm and ammunition.  I am know this address to be associated with ███ based on observations of ███ at that location by law enforcement on multiple occasions.

36.     On November 9, 2020, HURLOCK, using the **TARGET PHONE**, and ███ had the following exchange:

| | |
|---|---|
| 4:01 PM HURLOCK: | "Bro do me a solid" |
| 4:01 PM ███: | "Wassupp" |
| 4:02 PM HURLOCK: | "Use some alcohol or bleach and wipe the bitch down for me I know how yah hill niggas get busy," "I need that piece of mind," and "I appreciate you bro" |
| 4:04 PM ███: | "You know the vibes" |
| 4:04 PM HURLOCK: | "Facts I'm glad yah like that. It was my personal had that bitch decked" |
| 4:05 PM ███: | "You know niggas offer me 1500 for it" |

4:05 PM HURLOCK:          "Take that I got two more coming. One came in today"

37.      In this conversation, I believe that HURLOCK is requesting that ███ take measures to remove HURLOCK'S fingerprints and/or DNA from the firearm ["Use some alcohol or bleach and wipe the bitch down for me"] that HURLOCK had just sold to ███ HURLOCK indicated that it had been his personal firearms ["it was my personal"] and he wanted any trace evidence removed from the firearm because he knows it could likely be used in other crimes ["I know how yah hill niggas get busy"] and that he wants "piece of mind" that the firearm will not be linked back to him.

38.      On November 16, 2020, HURLOCK, using the **TARGET PHONE**, and ███ had the following exchange, wherein ███ also sends HURLOCK an image of what appears to be a Smith & Wesson, Model SD9VE, 9mm pistol:

| | | |
|---|---|---|
| 8:15 PM | ███ | "Yeoo" |
| 8:38 PM HURLOCK: | | "Yo" |
| 9:00 PM | ███ | messaged two photos of a firearm, and "Wanna trade for ya choppa" |
| 9:04 PM HURLOCK: | | "Hell na bruh lmao" |
| 9:04 PM | ███ | "Lmao iight", and "How much you want for you", "My mans want it" |
| 9:07 PM HURLOCK: | | "1250 brothers price", and "Sell it for 15" |
| 9:12 PM HURLOCK: | | "12 bro that's what I can do how much u want for it I'll find someone" |

39.      I believe in this conversation, ███ wanted to trade the Smith & Wesson for a "chopper," which I know to be a street term for AK-47 type rifles and pistols.  HURLOCK declined the trade but offered to sell the "chopper" to ███ for $1,200.00, suggesting that RUIZ sell it to his friend ["my mans"] for $1,500.00.

40.    On November 17, 2020, HURLOCK, using the **TARGET PHONE**, messaged ▮ a photo of a tan firearm and stated, "I just wanted to show u." The pictured firearm parts appear to include a tan Polymer80, model PF940C PMF frame with a slide and barrel with an eagle head logo (Figure 5). The frame appears to have not been finished, and it lacks the trigger and all internal parts that would be otherwise visible. The slide is not attached to the frame, as the frame has not been milled out to accept the barrel and slide. This picture shows the parts on an off-white table with some speckling. The imprinted logo on the table appears to read, to the extent visible, "National Public Seating," which I know to be a company making plastic folding tables.



*Figure 5*

41.    Shortly after, ▮ responded, "Damm," and "That shit fire." Shortly thereafter, HURLOCK sent two more photos of firearms with the message, "I really like tan

frame w black slide." The first picture (Figure 6) appears to show a tan Polymer80, model PF940C PMF frame and an unmarked black slide with a barrel with threads to accept a silencer. The frame appears to have not been finished, and it lacks the trigger and all internal parts that would be otherwise visible. The slide is not attached to the frame, as the frame has not been milled out to accept the barrel and slide. This picture shows the parts on what appears to be the same off-white table with speckling as Figure 5. The floor of the room is visible and appears to be a poured concreate floor.



*Figure 6*

42.     The second picture (Figure 7) includes a black Polymer80 frame and a tan slide with and barrel with an eagle head logo. The frame appears to have not been finished,

and it lacks the trigger and all internal parts that would be otherwise visible.  The slide is not attached to the frame, as the frame has not been milled out to accept the barrel and slide. This picture shows the parts on what appears to be the same off-white table with speckling as above.



*Figure 7*

43.     In response to HURLOCK acknowledging that he likes the "tan frame w black slide," ■ responds, "me 2", and "I need one of em shit."  HURLOCK replies, "Bro lmk exactly what colors you want and I'll make one these are both ready to go soon as I finish."

44.     A short time later, HURLOCK messaged ■ stating, "Get rid of this stuff too." ■ responded, "What stuff," to which HURLOCK replied, "Msgs."  I believe in this

exchange, HURLOCK is instructing ██ to delete any text messages between them to prevent others, including law enforcement, from being able to identify HURLOCK as the person making and selling firearms to ██

45.    Later that same day, at 9:39 PM HURLOCK, using the **TARGET PHONE**, messaged ██ what appeared to be a screenshot from a iPhone using the internet browser for a search of "p80 colors."   The captured image shows a variety of Polymer80 PMF frames, large and small, in six colors including black, blue tin, cobalt, tan and green.   The following exchange then occurred:

| | |
|---|---|
| 9:40 PM ██ | "That small grey one fire" |
| 9:42 PM HURLOCK: | "I like the grey too" |
| 9:42 PM ██ | "See how much for everything", "I'll pay" |
| 9:43 PM HURLOCK: | "I'll let you know bro you want me to find cheap stuff?" |
| 9:43 PM ██ | "Yea so I could make flips" |
| 9:48 PM HURLOCK: | "Ok bro" |
| 9:48 PM ██ | "Iight bro good looks" |

46.    In this conversation, I believe that HURLOCK was asking ██ to identify the color ██ would like for a firearm to be built by HURLOCK ["That small grey one fire . . . see how much for everything"].   The two then discuss how many ██ will buy, and how ██ wants HURLOCK to buy cheaper parts so that ██ could resell the firearms to others at a profit ["yeah so I could make flips"].

47.    I am also aware of a recent recovery of a PMF pistol in New Haven, CT on June 22, 2021 that I believe was manufactured by HURLOCK.   Specifically, on or about June 16, 2021, members of the New Haven Police Department's ("NHPD") were investigating ██ ██ on a belief ██ was in possession of firearms.

This included observing him that day with a firearm on one of his social media accounts. NHPD observed ███████ operating a Honda and stopped him pursuant to the detailed information they had obtained. Officers recovered a high-capacity magazine loaded with five live rounds.  Later that day, officers received a Connecticut Superior Court search warrant for ███████ vehicle.  During the execution of the warrant, on June 22, 2021, NHPD recovered an olive drab green Polymer80 9mm pistol with a laser aiming device and no serial number (Figure 8).  The firearm was loaded with 10 live rounds of ammunition. The recovered firearm is generally the same type and consistent with pictures and written descriptions of the PMFs sent by HURLOCK to ████ although this specific firearm does not appear to be represented in photos sent by HURLOCK to ████



*Figure 8*

48.     ████ and ████████ are known associates from the same area of New Haven. Through investigation, to include separate CI information as well as NHPD'S Ops Center

database, telephone number (475) 655-8797 was associated with ██████ (the "█ Phone"). I located communications between the ██ Phone and the ████ Phone beginning in June 2020, with the bulk of the conversation occurring in December 2020.

49.    On December 26, 2020, at 6:43 p.m., ██ messaged ██████ a screenshot of HURLOCK'S contact information, listed as "Dan Dan" with the telephone number assigned to the **TARGET PHONE**.

50.    On December 27, 2020, ██████ and ██ had the following conversation:

1:07 PM ████████        "And I need shells woe I just grabbed sumthin"
1:07 PM ██████          "Shells for what"
1:07 PM ████████        "Twin to ya shit"

51.    In this conversation, I believe that ██████ is asking ██ for "shells" meaning ammunition. When ██ asks what type of ammunition ██████ needs ["Shells for what"], ██████ advised that he needs ammunition for a firearm that is the same make and model as ██ firearm ["Twin to ya shit"]. Based on nature of the firearm recovered from ██████ at Figure 8, as well as the connection between ██████, ██ and HURLOCK, as described above, I believe it to be probable that the firearm recovered from ██ in June 2021 was manufactured by HURLOCK, in light of ██████ having obtained HURLOCK's telephone number from ██ only a few months prior.

52.    Finally, toll records obtained from the **TARGET PHONE** show that HURLOCK continues to use the device in furtherance of the Target Offenses. For example, toll records dated January 9, 2021 show that beginning at approximately 3:26 p.m., the **TARGET PHONE** makes numerous, consecutive outgoing calls to phone numbers associated with The Sporting Shoppe, Mid-State Guns, Firearms Unlimited LLC, Kanes' Gun Shop, Flint Armament, and Big Bear Hunting and Fishing. All of these businesses are

stores located in Rhode Island that sell firearms, ammunition and accessories.  Additionally, toll records show that on January 20, 2021, beginning at approximately 4:17 p.m., the **TARGET PHONE** was used to make consecutive calls to Big Bear Hunting and Fishing, Primary Arms, Midway USA, Bob's Gun & Archery Pro Shop, LaRocca Gun Works, inc., Stony Acre Sports, and again to Bob's Gun & Archery Pro Shop.  Primary Arms and Midway USA have national reputations and sell firearms, ammunition and accessories, and maintain robust call-in and internet orders.  Bob's Gun & Archery Pro Shop, LaRocca Gun Works, inc., and Stony Acre Sports also maintain websites for commercial activity and are located in Massachusetts.  Moreover, in total, beginning in January 9, 2021, the **TARGET PHONE** contacted Big Bear Hunting and Fishing at least five times, most recently on August 13, 2021.

53.     Based upon my training and experience, and in consultation with other law enforcement officers, I know that cellular telephones store voice mail messages, names, telephone numbers, addresses, sent and received text messages, and images on their digital memory.  Similarly, web addresses and websites that have been viewed via the Internet are typically stored on the device for a period of time.  A thorough search of digital media, such as the **TARGET PHONE**, for evidence of a crime commonly requires a qualified expert to conduct the search in a laboratory or other controlled environment.  This is true for the following reasons:

(a)     Searching digital media is a highly-technical process which requires specific expertise and specialized equipment.  There are so many types of digital media in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it

may also be necessary to consult with personnel who have specific expertise in the type of digital media that is being searched.

(b)     Searching digital media requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Since such data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential in conducting a complete and accurate analysis of the equipment and storage device from which the data can be extracted.

54.     In searching for evidence, fruits, and instrumentalities of criminal activity within the **TARGET PHONE**, as set forth herein, the Government will employ the following procedures:

(a)     The **TARGET PHONE** will be transported to an appropriate law enforcement laboratory for review to determine whether the contents of the **TARGET PHONE** contain evidence and instrumentalities of violations of federal law.  The **TARGET PHONE** and the contents thereof will be reviewed by appropriately trained personnel in order to extract and seize any data that relates to the fruits, instrumentalities, and evidence in violation of the Target Offenses.

(b)     If searching authorities determine that none of the data contained on the **TARGET PHONE** falls within any of the items authorized to be seized pursuant to the warrant, law enforcement personnel will return the **TARGET PHONE** within a reasonable period of time, unless further authorization is obtained from the Court.

55.     Based upon the foregoing, there is probable cause to believe, and I do believe, that a search of the **TARGET PHONE** will provide evidence of a violations of the Target Offenses, among others, specifically as it relates to HURLOCK, ███ ████████ and others known and unknown may have conspired to manufacture or sell firearms in the town of Thompson, CT and the city of New Haven, CT.  The evidence contained in the **TARGET PHONE** includes photos of firearms, firearm parts, the manufacturing process, and locations related to these items and activities, as well as communications involving these items and activities, locations at which these activities have taken place and/or where the items are being stored, and the websites and business contacts utilized to acquire firearms or firearm parts.  I therefore respectfully request that the attached warrant be issued authorizing the search and seizure of the **TARGET PHONE**.

### C.     Evidence of the Target Offenses at the TARGET PREMISES

56.     Based upon evidence collected from the ███ Phone, including numerous images and messages sent by HURLOCK between June 30, 2020 and March 28, 2021, as well as U.S. Postal records and call detail records obtained regarding **TARGET PHONE**, there is probable cause to believe, and I do believe that HURLOCK is utilizing the **TARGET PREMISES** to maintain and store firearms, firearm parts, and equipment being used to manufacture firearms.

### *Firearms and Firearm Parts at the TARGET PREMISES*

57.     Specifically, in a number of the images sent by HURLOCK utilizing the **TARGET PHONE** to ███ areas around the firearms being displayed appear to be consistent with the paint, trim, and flooring of the **TARGET PREMISES**.

58.     For example, in addition to the two firearms contained in the image at Figure 2 above, which were sent by HURLOCK to ███ on September 24, 2020, also visible in this image is what appears to be a kitchen laminate floor consisting of green lines with various tan and orange shaped tiles.   A social media posting on June 16, 2021 by HURLOCK's wife, A.R., whose is believed to reside at the **TARGET PREMISES**, depicts a video montage of a young child, surrounded by toys in a carpeted room with a doorway leading to another room, potentially a kitchen, that appears to have a similar type of laminate flooring in tan and orange shapes consistent with the flooring pattern observed at Figure 2.



*Figure 9*

59.     Figure 3 was also sent by HURLOCK to ███ on that same date using the **TARGET PHONE.**  Behind the black Polymer80 firearm and magazine appear several objects on the table including a cellphone charging cord, a hanger, sunglasses, and a key

fob, which appears consistent with a Volkswagen vehicle. As set forth above, HURLOCK's wife, A.R. has a Volkswagen vehicle that has been observed parked at the **TARGET PREMISES** as recently as August 10, 2021.

60.    Figure 4, the third image sent by HURLOCK to ███ on that same date using the **TARGET PHONE,** depicts an AR-15 type rifle leaning on a wood-paneled wall with a carpeted floor. The wall trim within the image appears to be a light beige or white, with the wall being a darker tan or brown. ████ ██ ███ ███ ██ ██ ███ ██
████ ███ ███ ████ ██ ████ ███ ███ ██ ██ ███
███ ██ ███ ████ ████ ██ ███ ███ ███ ███
████ ██ ██ ███ ██ ████ ████ ███ ███ ███
███ ███ ██ ███ ███ ███ ██ ████ ███ ██ ████ █
████ ████ ████ ██ ███ ██

61.     Figures 5, 6, and 7, which were sent by HURLOCK to ■■■ using the **TARGET PHONE** on November 17, 2020, as set forth above, also display a series of firearms, each of which appears to be resting on an off-white speckled plastic table. Within Figure 5, this table appears to be visibly embossed with the words "National Public Seating," (Figure11), which I know to be a company that makes plastic folding tables.



*Figure 11*

62.     Figures 6 and 7, in addition to displaying the table, also appear to show portions of a concrete floor. On HURLOCK's public Facebook account, I observed a video posted by HURLOCK on April 11, 2015 wherein HURLOCK appears to be working on a motorcycle in a garage. There is also a quad in the background and the walls are made of, or paneled in, wood. Visible and leaning up against the wall is a white or off-white folding plastic table (Figure 12), that appears consistent with the plastic folding tables made by National Public Seating, and specifically, the plastic table visible in Figures 5, 6, and 7.



*Figure 12*

63.     Further identifying the **TARGET PREMISES** as the location where HURLOCK maintains firearms, firearm parts, and tools to manufacture firearms, on August 3, 2021, ATF received information from United States Postal Service Inspection Service that on March 30, 2021, HURLOCK received a package at the **TARGET PREMISES** shipped from Sick Guns LLC, 1664 S Research Loop Ste 240, Tucson Arizona.  Sick Guns LLC, also known as SG Firearms, sells Glock and PMF parts, and also customizes firearms for customers.

64.     Evidence obtained from the ▇▇ Phone with HURLOCK using the **TARGET PHONE** shows conversations wherein HURLOCK explains to ▇▇ the prices to obtain PMF firearm parts and special tools used in the building of PMF firearms,

consistent with the parts being sold by Sick Guns LLC and others.    For example, on November 28, 2020, HURLOCK and ▆▆ had the following exchange:

| | | |
|---|---|---|
| 10:39 PM HURLOCK: | "My nigga bro I owe u one" | |
| 10:43 PM ▆▆ | sent HURLOCK a picture of a male holding a small rifle type firearm. | |
| 10:47 PM HURLOCK | responded with an internet picture of a full size rifle, and "This comin next but it's a lot smaller" | |
| 10:47 PM ▆▆ | "That shit nice" | |
| 10:48 PM HURLOCK: | "It's 500 with just the upper then I need lower, bcg and charging handle with the mag and sights so it runs out 900-1000" | |
| 10:48 PM ▆▆ | "Damm" | |
| 10:52 PM HURLOCK: | "Yea it ain't cheap bro plus it take big bread just to buy the right tools. It's worth it tho bro the black shit I had was like 850 so I made about 350. It's plenty more room to make $$ im doin shit cheap 12 is a solid deal" | |
| 10:53 PM ▆▆ | "Hell yea", "We gonna make bread trust we good" | |

65.    In this portion of the conversation, ▆▆ and HURLOCK, using the **TARGET PHONE**, discuss what types of rifles, or at least rifle-based pistols, ▆▆ might want, and how much it will cost ["it's 500 with just the upper then I need lower, bcg and charging handle with the mag and sights so it runs out 900-1000"].  HURLOCK also makes clear that the tools required to build PMF firearms are unique and expensive ["plus it take big bread just to buy the right tools"].  The two agree they will both make money when ▆▆ sells that type of firearm ["We gonna make bread trust we good"].

66.    On March 28, 2021, HURLOCK and ▆▆ had the following exchange:

30

| | |
|---|---|
| 5:49 PM HURLOCK: | "Yo they sent me a fucked up frame I gotta figure out if I should just fix it or wait til they get back to me and send me new one" |
| 5:49 PM ▮▮▮▮▮ | "Lmk" |
| 5:51 PM HURLOCK: | "If I fix it I void the warranty and it's no gaurentee that shit gonna be working 100%. It's 150$ frame I could just order a new one too" |

67.     In this conversation, I believe that HURLOCK is telling ▮▮▮ that he has at least some PMF parts shipped to him, and that this particular frame was flawed ["Yo they sent me a fucked up frame I gotta figure out if I should just fix it or wait til they get back to me and send me new one"].  He closed by stating he could acquire a new one, rather than attempt to correct the problems with the received part ["I could just order a new one too"].

68.     I know from my training, experience, and conversations with ATF Special Agents with expertise in the field, that in order to complete a commercially available PMF kit, the builder need to remove material from the product.  This is typically accomplished with the use of a jig with locating holes to precisely locate where to drill, and bulk removal of larger areas, as needed.  The majority of the commercially available kits include the jig, the required drill bits, and instructions.  Many kits for larger firearms, such as AR-15 style lower receivers, include milling bits (similar to drill bits, but used for removing larger amounts of material from both the bottom and sides of the bit).

69.     I also know that the jigs and drill and milling bits are included in each kit, but can be used by builders multiple times, leading to an inventory of jigs and bits for persons making multiple firearms as I believe HURLOCK to be doing at the **TARGET PREMISES**.  This is because if the builder were to make a slight error or break a bit, they would have spares of each to complete their current firearm build.

31

70.     I also know that ATF has the technical capability to forensically examine any recovered material that appears to have been removed from a PMF during the build process. ATF's forensic laboratory can conduct a chemical analysis of any recovered material and determine if it is of the same composition of known samples, to include other purchased or recovered PMFs.  The ATF forensic laboratory also has the ability to extract material from tools such as drill bits and cutting and grinding tools, such as abrasive discs, cones and wheels, as well as sandpaper and other smoothing materials.  Such material can then be tested and analyzed, as indicated above.

71.     I also know that the ATF laboratory, via toolmark examiners, has the ability to examine marks made in a material with a specific tool and/or a family or type of tool. Since all tools designed to remove material leave patterns in the remaining material, ATF has the ability to compare the patterns and marks with seized tools also submitted as evidence.  While the extent of ATF's ability varies based on the tools used, and the materials in question, the potential for an exact match, akin to a fingerprint, is possible.  As part of this investigation, ATF would attempt to compare any tools recovered from HURLOCK with the firearm recovered from ▮▮▮▮ as well as other PMFs that may have been recovered but not yet linked to either ▮▮ or HURLOCK.

### HURLOCK Meets Firearm Customer Near the TARGET PREMISES

72.     In additional conversations from the ▮▮ Phone, HURLOCK coordinates the purchase of a firearm no more than six miles from the **TARGET PREMISES**, which I believe further shows HURLOCK to be using the **TARGET PREMISES** to manufacture firearms and store both firearms and manufacturing equipment.

73.     Specifically, on November 28, 2020, HURLOCK, using the **TARGET PHONE**, and ██ engaged in the following conversation:

| | | |
|---|---|---|
| 6:16 PM HURLOCK: | "Let me get back to u in a few mins bro" |
| 6:17 PM ██ | "Tight I just need the addy to send him to you" |
| 6:17 PM HURLOCK: | "Who is it bro" |
| 6:18 ██ | "Lil lil young bull bro you good trust I already told em wassup wrrda my dauther you good" |
| 6:21 PM HURLOCK: | "Bro that's unnecessary you don't gotta do all that I know the vibes. You know me tho nigga I'm ready to die niggas can't catch me with my pants down." |
| 6:22 PM ██: | "Nah trust you know the vibes with us I would never do nothing like that to you," "You really my nigga" |
| 6:23 PM HURLOCK: | "I know you bro I already told your other bro if my nigga send you to me I don't even gotta question. You never given a reason not to bro" |
| 6:25 PM ██: | "Facts you know the vibes so let me know waspp they just got banged on so they wanna come go back hard" |
| 6:25 PM HURLOCK: | "999 quaddick town farm road that's my shop," "Thompson ct," "It's a troop" |

74.     During this portion of the conversation, I believe that ██ and HURLOCK are discussing the fact that ██ wants to send someone else to pick up firearms from HURLOCK ["who is it bro"]. Once HURLOCK is convinced that he can trust ██ to send someone else ["I know you bro I already told your other bro if my nigga send you to me I don't even gotta question"], he provides the address of ██ ██████ ████ ████████ in Thompson, CT, noting that this is his "shop."

75.     The investigation has revealed that HURLOCK is, in fact, associated with this address, which is approximately 5.5 miles from the **TARGET PREMISES**. The

business located at ███ █████████ █████ ██████████ in Thompson, CT is ████████████.
According to the website, ███████████████ makes products relating to fire resistant mats,
hearths, and other protective equipment for fireplaces and wood burning stoves. The named
principle of the business is P.B., who HURLOCK listed in Connecticut Department of
Corrections data from 2018 to be his grandmother. Available records indicate that P.B.
owns 91 Riverside Drive and resides along with her husband in the "A" half of the residence.
As set forth herein, HURLOCK is believed to reside in the "B" half of the residence, the
**TARGET PREMISES**.

### *Completed Firearms at the TARGET PREMISES*

76.     Contained with the ████ Phone, I observed a conversation with another
contact, ██████ █ █████ ██████████ spanning June 21, 2020, through August 3, 2020. As
part of this conversation, on June 27, 2020, ████ messaged ██████ an image of what appears
to be a chrome Ruger Vaquero .44 cal. Revolver (Figure 13).



*Figure 13*

77.     Five minutes later, ███ sent a video of a person shooting the revolver in a wooded setting.  In reviewing the video, I can clearly identify that the person shooting the firearm as HURLOCK.  A still taken from the video appears below (Figure 14):



*Figure 14*

78.     I also located another video on the ███ PHONE of HURLOCK shooting what appears to be a HiPoint pistol with an extended magazine (Figure 15).  This video appears to have been created on or about June 27, 2020.  In the beginning of this video, an

unknown black male can be seen putting the silver Ruger revolver into a black bag on the ground, and HURLOCK is wearing the same clothing in both videos.  As indicated above, I know that on July 22, 2020, HURLOCK told ███ that he (HURLOCK) had sold someone else a HiPoint pistol.



*Figure 15*

79.     Additionally, in this video, HURLOCK appears to fire a number of rounds, approximately three of which can be heard hitting a metal object.  I know from my training and experience that shooting metal targets designed to be shot at, creates a distinctive sound, and that this is the sound that can be heard in the video.

80.     I know from both surveillance at the **TARGET PREMISES** and through publicly available images, including Google Maps, that the **TARGET PREMISES** is surrounded in the rear, by a large, forested area that appears to be consistent with the area pictured in the videos (Figure 16).



*Figure 16*

81.     Further, since HURLOCK advised ▮ on a number of occasions that he possessed firearms for his personal use—such as on November 7, 2020 when he tells ▮ "I want something to *match my other Glock 19* so I got twins," or on November 9, 2020 when he tells ▮ "It was my *personal* had that bitch decked," or on November 16, 2020, when ▮ asked HURLOCK if HURLOCK wanted to trade a Smith & Wesson pistol for HURLOCK'S "choppa" in reference to an AK-47 type firearm and HURLOCK declined— I believe that there is probable cause to believe that evidence of the Target Offenses will be located in the **TARGET PREMISES**.  This is further supported by photographs sent by

HURLOCK, and referenced above, where items in the background of the pictures appear to be personal in nature such that they would be located within a residence.

82.    I also know from my training, experience, and conversations with other law enforcement officers, that prohibited persons involved in the unlawful sale of firearms, to include the manufacture of PMFs, generally retain firearms for themselves.  This is due in part to the difficulty in obtaining commercially made firearms, and the cost and effort to complete PMFs.  Selling firearms is also a potentially dangerous endeavor, and such sellers overwhelmingly retain firearms for protection.   For example, on November 28, 2020, HURLOCK messaged ███ that "You know me tho nigga I'm ready to die niggas can't catch me with my pants down."  I interpret this to mean that, in the event of a violent conflict, HURLOCK is prepared to answer potential firearms violence with his own firearm.

83.    I also know that firearms are durable and long-lasting.  Prohibited persons in possession of firearms, for the reasons indicated above, tend to keep them for long periods of time as they do not wear out and are not consumed after use, such as is the case with narcotics.

### *Biometric Access to the Target Phone*

84.    This warrant permits law enforcement to compel HURLOCK to unlock any devices, including the **TARGET PHONE** requiring biometric access subject to seizure pursuant to this warrant.  The grounds for this request are as follows:

(a)    I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password.  These

biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

(b)      If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

(c)      If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

(d)      If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on

patterns within the user's irises.  The device can then be unlocked if the infrared-sensitive camera detects the registered irises.  Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

(e)     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.  This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

(f)     As discussed in this Affidavit, your Affiant has reason to believe that one or more digital devices will be found during the search.  The passcode or password that would unlock the devices, including the **TARGET PHONE** subject to search under this warrant currently is not known to law enforcement.  Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, including the **TARGET PHONE**, making the use of biometric features necessary to the execution of the search authorized by this warrant.

(g)     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled.  This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time.  For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours *and* the passcode or password has not been entered in the last 6 days.  Similarly, certain Android devices cannot be unlocked with Trusted

Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

(h)     Due to the foregoing, if law enforcement personnel encounter devices, including the **TARGET PHONE** that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of HURLOCK to the fingerprint scanner of the devices, including the **TARGET PHONE** found at the **TARGET PREMISES**; (2) hold the devices, including the **TARGET PHONE** found at the **TARGET PREMISES** in front of the faces of HURLOCK and activate the facial recognition feature; and/or (3) hold the devices, including the **TARGET PHONE** found at the **TARGET PREMISES** in front of the faces of HURLOCK and activate the iris recognition feature, for the purpose of attempting to unlock the devices, including the **TARGET PHONE** in order to search the contents as authorized by this warrant.  The proposed warrant does not authorize law enforcement to compel that HURLOCK state or otherwise provide the password or any other means that may be used to unlock or access the devices, including the **TARGET PHONE**.  Moreover, the proposed warrant does not authorize law enforcement to compel HURLOCK to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices, including the **TARGET PHONE**.

## IV.     <u>CONCLUSION</u>

85.     Based on his interactions with ███ as reflected in the ███ Phone, as well as toll records for the **TARGET PHONE** and U.S. Postal records for the **TARGET**

41

**PREMISES**, there is probable cause to believe, and I do believe, that HURLOCK is utilizing both the **TARGET PHONE** and the **TARGET PREMISES** in the manufacturing of PMFs and for unlawfully selling them to other prohibited persons, in violation of 18 U.S.C. §§ 922(a)(1)(A), 922(d) and 922(g)(1) (the Target Offenses).  I also believe that evidence of these offenses will be located in the **TARGET PHONE** and the **TARGET PREMISES**.

Matthew Borges
ATF Task Force Officer

Sworn to and subscribed before me on this the ___30___ day of August 2021.

HON. ROBERT A. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

## PLACE TO BE SEARCHED

### The Target Premises: 91B Riverside Drive, Thompson, CT

The Target Premises, 91B Riverside Drive, Thompson, CT is the right side (south side) of a two-family, two story structure.  The home is green with tan shutters and "91B" appears on the right side of the door frame.  The front door, which is white, has a sectioned half-moon window towards the top of the door.  There is a dirt driveway on the right side of the front yard, and white fence that encloses at least a portion of the rear yard.  The garage is connected to the rear of the structure via a short breezeway or hallway.



**ATTACHMENT A**

**PROPERTY TO BE SEARCHED**

**The Target Phone**

The property to be searched is one iPhone XR cellular telephone with phone

number (860) 455-8037 with service provider Verizon d/b/a Cellco Partnership.

# ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEIZED

### The Target Premises

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use of which is or has been used as the means of committing a criminal offense, namely, violations of 18 U.S.C. § 922(a)(1) (Engaging in Firearms Business Without a License); 18 U.S.C. § 922(g) (Unlawful Possession of a Firearm by a Convicted Felon); and 18 U.S.C. § 922(d) (Providing a Firearm to a Prohibited Person), including:

    a.  Firearms, ammunition and other weapons;

    b.  Firearm frames or receivers, components, suppressors, parts or combination of parts used in the manufacture of firearms;

    c.  Tools, drill bits, machining items and other evidence that supports the manufacturing of firearms, including tools for joining or cutting metal or polymer and engraving and stamping equipment; machining tools, to include lathes, drills, and grinding tools;

    d.  Any polymer or metal residue, cast-offs, shavings, or particles consistent with having been removed from a polymer or metal PMF kit;

    e.  Any purchase and sales invoices, shipping documentation, vendor lists of names, addresses and telephone numbers, ledgers, notes detailing type and quantity of firearms, parts or components, other documentation relating to the purchase, manufacture or possession of firearms, including templates, jigs, forms to shape firearms, and diagrams;

    f.  Firearm safes and other secure storage containers and their contents;

    g.  Books, records, receipts, notes, ledgers, and other papers and documentation relating to the communication, orders and processing, storage, transportation, payment, acquisition and/or distribution of firearms, firearms parts, and/or tools and equipment used in the manufacture of firearms;

    h.  Addresses or telephone numbers in books, papers, cellular telephones, tablets or computers, and their electronically stored contents, which reflect names, addresses, telephone numbers of and communications to or from their associates and/or clients in firearms trafficking activity and/or suppliers of firearms, firearms parts and/or tools and equipment used in the manufacture of firearms; photographs and videotapes of participants and associates in firearms trafficking activity and property acquired as a consequence of firearms trafficking activities.

**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEIZED**

**The Target Phone**

All records, information, photographs, images, videos, call logs, contacts, text messages, internet browsing history, and calendars, in any format, including any associated metadata, as well as geo-location information, that constitute evidence of a potential violations of 18 U.S.C. § 922(a)(1) (Engaging in Firearms Business Without a License); 18 U.S.C. § 922(g) (Unlawful Possession of a Firearm by a Convicted Felon); and 18 U.S.C. § 922(d) (Providing a Firearm to a Prohibited Person), including but not limited to the following:

1.  any and all records, including any photographs, concerning the purchase, manufacture, sale, use, or transfer of any firearms (including parts or materials);

2.  the telephone number, ESN number, IMEI number, other identifying number, serial number, and SIM card number of the Target Phone;

3.  the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of the Target Phone;

4.  descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes;

5.  any and all records, however created or stored, which tend to demonstrate ownership and use of the Target Phone, and identification bearing the name or photograph of any person, telephone books, address books, date books, calendars, personal files, and photographs of persons contained in the Target Phone;

6.  any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the Target Phone, such as passwords, sign-on codes, and program design;

7.  GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

8.  saved searches, locations, and route history in the memory of the Target Phone;

9.  internet browsing history, to include, internet searches in the memory of the Target Phone; and

10. images and videos in the memory of the Target Phone.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

It is specifically authorized that stored electronic information, data, information and images contained in the above-described Target Phone may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device.

During the execution of the search of the Target Premises described in Attachment A, law enforcement personnel are also specifically authorized to compel Daniel Hurlock to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

(a)      any of the devices, including the Target Phone found at the Target Premises, and

(b)      where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments,

for the purpose of attempting to unlock the device's security features in order to search the contents as authorized by this warrant.

This warrant does not authorize law enforcement personnel to compel any other individuals found at the Target Premises to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device, including the Target Phone. Further, this warrant does not authorize law enforcement personnel to request that Daniel Hurlock state or otherwise provide the password or any other means that may be used to unlock or access the devices, including by identifying the specific biometric characteristics (including

the unique finger(s) or other physical features) that may be used to unlock or access the devices, including the Target Phone.